# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SHAWN HAMPTON,** | : | **CIVIL ACTION NO. 1:12-CV-0434** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **JOHN E. WETZEL,** *et al.*, | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Presently before the court in the above-captioned matter is a motion (Doc. 42) pursuant to Federal Rule of Civil Procedure 56 filed by defendants John Wetzel ("Wetzel"), Dorina Varner ("Varner"), Richard S. Ellers ("Ellers"), Margaret M. Gordon ("Gordon"), Marirosa Lamas ("Lamas"), William Williams ("Williams"), Gary Sowash ("Sowash"), Shawn Kephart ("Kephart"), and Reverend Uli Klemm ("Klemm").  Together, the defendants seek summary judgment as to all claims asserted by plaintiff Shawn Hampton ("Hampton"), an inmate housed at the State Correctional Institution at Rockview ("SCI-Rockview") in Bellefonte, Pennsylvania, who alleges that defendants, collectively and individually, failed to provide him with a therapeutic diet free of shellfish and onions during the Holy Month of Ramadan in 2011, violating his rights under the First, Eighth, and Fourteenth Amendments, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* For the reasons that follow, the court will grant in part and deny in part defendants' motion (Doc. 42) for summary judgment.

## I.   <u>Standard of Review</u>

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  <u>See</u> Fed. R. Civ. P. 56(c).  The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); Fed. R. Civ. P. 56(e); <u>also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986); <u>see also</u> Fed. R. Civ. P. 56(c), (e).  Only if this threshold is met may the cause of action proceed. <u>Pappas</u>, 331 F. Supp. 2d at 315.

## II.   <u>Statement of Material Facts</u>

Hampton has documented food allergies to onions and shellfish dating back to his childhood.  (Hampton Dep. 15:23-18:19, Feb. 1, 2013).  As a result, he has received a therapeutic diet tray at every place of imprisonment since his initial incarceration in the Philadelphia County Prison in 2005.  (<u>Id.</u> at 24:15-18).  At all times relevant to this action, Hampton was a state inmate incarcerated by the Pennsylvania Department of Corrections ("DOC") at SCI-Rockview.  (Doc. 43 ¶ 1; Doc. 51 ¶ 1).  The DOC's Food Service Policy, DC-ADM 610, vests authority in defendant Wetzel, as Secretary of the DOC ("Secretary"), to establish a policy

2

regarding the operations of Food Services areas within the DOC.  (Doc. 48-2 at 1).

The DOC policy defines a therapeutic diet as "[a] diet or dietary regimen prescribed

by a physician, dentist or psychiatrist, used as a therapy for a medical condition as

part of an overall health care plan."  (Id. at 2, 5).  Once placed on a therapeutic diet,

an inmate is required to comply with a number of rules.  (Id. at 5.)  If an inmate is

noncompliant with the therapeutic diet program,  he is "referred to the appropriate

medical personnel for mandatory counseling regarding the need to adhere to the

diet and the health related consequences of non-compliance."  (Id. at 6).  The

Secretary may only suspend the Food Service Policy in the event of an emergency

or extended disruption of normal facility operations.  (Id.)

   The DOC's Dietary Services Specialist, defendant Gordon, under the

supervision of defendant Ellers, prepared a Nutritional Assessment for Hampton.

(Doc. 43 ¶¶ 6-7, 107; Hampton Dep. 61:13-62:25).  "DOC menus are designed

calorically to maintain a healthy body weight and to provide adequate amounts of

protein, vitamins, minerals and other nutrients needed to sustain an inmate's

health."  (Doc. 43 ¶ 105).  Since being incarcerated at SCI-Rockview, Hampton has

not had an allergic reaction to either onions or seafood as they are not put on his

tray and he does not eat them.  (Hampton Dep. 18:20-23).  His therapeutic diet at

SCI-Rockview is "bland food."  He describes his diet as follows:

So today for lunch is chili con carne, I will just eat plain ground beef on a hamburger bun.  Essentially chili has beans, ground beef, onions, peppers, all that.  I won't get none of that.  I will just get plain ground beef before they add it to the sauce or I would receive just a hamburger.

. . .

Mostly everything is bland.  The diet reads there's no seafood, no onions, no spices, no peppers.  So let's say if they was having pasta salad, I would just get pasta, just plain cut noodles.  Instead of cole slaw I receive cabbage.  And when they have baked chicken, I just get plain baked chicken.  No seasonings or anything put on the chicken.  Most of my food was just bland.  No added ingredients.

. . .

For breakfast.  Yeah, they haven't changed the menu.  That's the only thing they have with I guess spices or whatever, what have you in it.  Most of the time, breakfast is cold cereal or hot cereal, grits, cream of wheat, oatmeal, a fruit and milk, orange juice or a fruit, you know, toast sometimes, butter occasionally.

. . .

[For dinner], [a]gain if chicken is the meal I'd just get plain chicken.  If hamburger is the meal, obviously I can eat hamburgers.  But they won't give me beans or pasta, salad they cook.  They've got a thing that they call a three bean salad.  I don't get that because they put onions in.  They just cook me plain wax beans.  Lunch and dinner is pretty much the same.  Just, you know, whatever the regular meal is, that dictates what the diet meal would be for me.

(Id. at 22:9-23:25).

Hampton has practiced the Sunni Muslim religion since he was thirteen or fourteen years old.  (Id. at 26:11-25.)  Prior to his incarceration, Hampton prayed five times a day, attended Islamic Jum'ah services every Friday, and observed the Holy Month of Ramadan, which requires abstention from food and drink from dawn until sunset.[1]  (Id. at 27:5- 12, 28:17-22, 34:24-35:6; Doc. 43-4 at 3).  During his imprisonment, Hampton continues to pray five times a day, attends Friday services (when he is not housed in the restricted housing unit ("RHU")), and observes the Ramadan holiday.  (Hampton Dep. 27:5-20).

On June 1, 2011, in preparation for the 2011 observance of Ramadan, defendant Kephart, director of the Bureau of Treatment Services, distributed a memorandum entitled "2011 Observances of Ramadan, Eid al-Fitr and Eid al-Adha Prayers and Meals" to all prison superintendents and various other officials within the DOC.  (Doc. 43 ¶¶ 17, 20-21; Doc. 51 ¶¶ 17, 20-21; Doc. 43-4 at 2-6).  The memo is authored by defendant Klemm, the Religion, Volunteer & Recreational Services Program Administrator at SCI-Rockview, and identifies the criteria inmates must meet to participate in Ramadan.  (Doc. 43 ¶ 20, 23; Doc. 51 ¶ 23).  The memo further states that:

---

[1] During the Holy Month of Ramadan, fasting begins with Fajr, or morning prayer, and lasts until Maghrib, or evening prayer.  (Id. at 27:5- 12, 28:17-22, 34:24-35:6; Doc. 43-4 at 3).

> Muslim inmates who are minors and those with documented
> medical limitations (*e.g.*, those on therapeutic diets) are not
> obligated to participate in Ramadan. . . .  Inmates with
> documented dietary or medical limitations should discuss
> the appropriateness of fasting with both the Imam/Muslim
> chaplain and the Corrections Health Care Administrator
> (CHCA) or designee. . . .  However, inmates with medical
> conditions who do **not** fast during the day should **not** join the
> communal meal after sunset and they should **not** receive
> Sahur Bags. [M]uslims with documented medical conditions
> are permitted to attend the Eid al-Fitr Meal (provided they
> have funds to pay for their portion of  non-DOC-supplied
> foods).  Food Service is unable to accommodate inmates with
> documented allergies to certain foods and who receive
> therapeutic diets with Ramadan therapeutic evening meals
> or Sahur bags.

 (Doc. 43 ¶ 24; Doc. 51 ¶ 24; Doc. 43-4 at 3 (emphasis in original)).

Inmates who elect to fast during Ramadan receive a Sahur bag for breakfast

before dawn.  (Doc. 43 ¶ 62; Doc. 51 ¶ 62).  Hampton describes the Sahur bag as

follows:

> It's mostly two bowls of cereal, a piece of fruit.  And the
> guards will bring around your milk and orange juice.  But
> certain items change or vary according to how the general
> population's breakfast is.  Meaning if general population
> has breakfast cake today, tomorrow night when we
> receive a sahur bags [sic] it will have breakfast cake in it.
> If they had eggs, we would have boiled eggs in our bag.  If
> they have something that it's not logical to bag up like
> creamed beef, they would replace it with peanut butter
> and jelly.  Peanut butter and jelly packs and two slices of
> bread.

(Hampton Dep. 36:10-25).  An evening meal is served after sunset according to the

Ramadan menus.  (Doc. 43 ¶ 63; Doc. 51 ¶ 63).  According to Hampton, a standard

Ramadan "evening meal is normally whatever the general population gets fed, we

get that meal as well as a portion-and-a-half.  So if it's a hamburger, we get a whole hamburger and we get a half a hamburger." (Hampton Dep. 37:2-5).  The increased quantity applies only to the protein portion of the meal, and there is no corresponding increase to the side dishes.  (Id. at 37:6-17).

At the start of the 2011 Ramadan season, Hampton was housed in the RHU. (Id. at 42:18-21; Doc. 43 ¶ 41; Doc. 51 ¶ 41).  Inmates within the RHU eat their meals in their cells; the meals are delivered by corrections officers.  (Doc. 43 ¶ 42; Doc. 51 ¶ 42).  Throughout Ramadan, Hampton was able to pray in his cell five times per day as required by his faith.  (Doc. 43 ¶ 50; Doc. 51 ¶ 50).  He was permitted to have a Quran and other religious materials, including handouts received from the Imam, in his cell and had access to the Imam two or three times per week.  (Doc. 43 ¶¶ 51-53; Doc. 51 ¶¶ 51-53).  Hampton also participated in the feast at the end of the 2011 Ramadan season. (Doc. 43 ¶ 54; Doc. 51 ¶ 54).

Hampton submitted a timely request to fast during Ramadan 2011. (Hampton Dep. 42:18-21; Doc. 43 ¶¶ 41, 68; Doc. 51 ¶¶ 41, 68).  Fasting during Ramadan is not a choice to those of the Sunni Muslim faith; it is obligatory as it is a commandment from Allah.[2]  (Hampton Dep. 29:1-4; Doc. 51 ¶ 26).  Hampton sought the advice of defendant Williams, SCI-Rockview's Health Care Administrator, regarding whether he should fast due to his therapeutic diet, but received no response.  (Hampton Dep. 64:1-12; Doc. 43 ¶ 12; Doc. 51 ¶ 12).  Hampton wanted to

---

[2]Although there are limited exceptions to fasting requirements during Ramadan, none apply to Hampton.  (Hampton Dep. 38:21-39:12).

receive his therapeutic diet tray at the same time that other Muslims who elected to fast during Ramadan received their evening trays. (See Doc. 43 ¶ 70; Doc. 51 ¶ 70). The following exchange took place during Hampton's deposition:

> Q.   So I'm trying to get at what exactly you wanted to happen during Ramadan 2011?
>
> A.   I just wanted my diet tray during Ramadan meals at that time.
>
> Q.   You wanted to receive your therapeutic diet tray at the same time Ramadan meals were served?
>
> A.   Yes.
>
> Q.   During Ramadan in 2011, did you receive the regular Ramadan meals the entire Ramadan period?
>
> A.   I'd have to say no to that.   Occasionally, in the beginning of Ramadan because of, I would say lack of communication maybe or individuals not knowing. I think maybe two or three times I received my diet tray, like the first week.
>
>       For instance, last year the guards would just- - -. They would send it down during the regular dinnertime.  But the guards would hold it.  And I'd send it back to the kitchen and they'd give it to me during the Ramadan meal.
>
> Q.   They did do that - - -
>
> A.   Right.
>
> Q.   - - - this past year?
>
> A.   Once or twice, once or twice.  It was only one guard who did it and he said it wasn't a big deal for him.  So he put it in the warmer or hot box or what have you and gave it to me when he'd bring the food around during the Ramadan meal on time.

> Q.      When the miscommunication happened back in 2011
>         and you received your therapeutic diet tray rather
>         than your Ramadan meal.  Did you complain to
>         someone about that?
>
> A.      I don't think I would have.  I received food I could eat
>         and that was okay with me.

(Hampton Dep. 44:21-46:3).  Hampton wrote to defendant Wetzel and expressed his

concerns about the denial of his therapeutic diet tray during Ramadan.  (Doc. 48-2

at 34).  He also wrote to defendant Sowash, a Corrections Food Service Manager 2

at SCI-Rockview, because "essentially he runs the food cart in the Department."

(Hampton Dep. 65:1-4).

On August 18, 2011, Hampton filed Official Inmate Grievance # 377868,

stating as follows:

> I have been denied my therapeutic diet tray since the
> begining [sic] of Ramadan, which is medically prescribed for
> food allergies (seafood & onions) because I am observing
> the sacred month of Ramadan (fasting) which is an
> obligatory commandment from Allah for all Muslims.  Being
> denied my diet tray makes it substantially hard to fast when
> more than half the foods on the master menu contains
> either onions or is that of a seafood product which denies
> me nutritionally adequate diet afforded to others and
> interfers [sic] with my medical treatment.  The only memo
> given out concerning Ramadan that was issued to me was
> dated July 20, 2011 from Tom Boldin, FCPD by
> Abdulrahman Abumurad, Imam and it did not mention that
> therapeutic diet trays would not be issued for the month of
> Ramadan.  Which denied me the due process to make an
> informed decision, as well as using food as a disciplinary
> measure because I'm practicing the tenets of my religion.
> Which is against Dept's policy (DC-ADM 610) and a [sic]
> established commandment from Allah in the holy Quran.
> I have been made to chose [sic] between my constitutional

> rights and my health and safety for the last four years which
> is unconstitutional and violations [sic] of U.S. statues [sic].
> These acts by SCI Rockview and DOC violates my First,
> Eighth, Fourteenth Amendments.  I am seeking that diet
> tray be issued during Ramadan, compensatory, punitive &
> nominal damages for there violations of my rights.

Doc. 43-2 at 85-86).  On September 2, 2011, Hampton received an initial review

response from "A. Winkleman, Correctional Food Service Manager 1," denying his

grievance with the following explanation:

> I've reviewed your grievance, and must admit I'm confused
> as to what relief you're seeking.  I do not know what memo
> Mr. Boldin, FCPD provided however I did speak to him and
> he stated that he has no record of you informing him that
> you were still receiving a therapeutic diet.  As I've
> personally told you in the past the DOC memorandum that
> authorizes the institutions to conduct Ramadan does state,
> in part . . .  Muslim inmates who are minors and those with
> documented medical limitations (e.g., those on therapeutic
> diets) are not obligated to participate in Ramadan.  Inmates
> with documented dietary or medical limitations should
> discuss the appropriateness of fasting with both the
> Imam/Muslim chaplain and the Corrections Health Care
> Administrator (CHCA) or designee. General population
> inmates who are not medically cleared to fast during
> Ramadan may still attend all other activities planned
> surrounding Ramadan (e.g. special classes, communal
> evening prayers).   However, inmates with medical
> conditions who do not fast during the day should not join
> the communal meal after sunset and they should not receive
> Sahur Bags . . .  [M]uslims with documented medical
> conditions are permitted to attend the Eid al-Fitr Meal
> (provided they have funds to pay for their portion of
> non-DOC-supplied foods).  **Food Service is unable to
> accommodate inmates with documented allergies to
> certain foods and who receive therapeutic diets with
> Ramadan therapeutic evening meals or Sahur bags**. The
> culinary department is following DOC policy as related to
> this matter and therefore your grievance is denied.

(Doc. 43 ¶ 27; Doc. 51 ¶ 27; Doc. 43-2 at 84 (emphasis in original)).  Hampton

appealed the denial, and on October 6, 2011, defendant Lamas, SCI-Rockview's

Facility Manager/Superintendent, upheld the denial, advising as follows:

> You have a choice during Ramadan.  You may continue
> to receive your diet tray but you are not then eligible to
> receive the Sahur Bags.  The Sahur Bags are provided to
> inmates that fast during the day.  If you receive your diet
> tray, you are not considered to be fasting.  Your second
> choice is to forgo your diet tray and receive the Sahur
> Bag; however the DOC will not require that "special" or
> therapeutic diet Sahur Bags be provided.  Your situation
> was handled properly in accordance with the Ramadan
> memo from the DOC.

(Doc. 43 ¶ 28; Doc. 51 ¶ 28; Doc. 43-2 at 81).  Hampton appealed Grievance # 377868

to final review.  Defendant Varner, Chief Grievance Officer with the Secretary's

Office of Inmate Grievances & Appeals, also upheld the denial, stating:

> You failed to provide any evidence that your rights have
> been violated or that you were denied your therapeutic
> diet trays during Ramadan.  You stated that you were
> fasting during the month of Ramadan.  A review of the
> record reveals that you have a choice during Ramadan.
> You may continue to receive your therapeutic diet trays,
> but then you are not eligible to receive Sahur bags.  Such
> bags are provided to inmates that fast during the day.  If
> you receive your therapeutic diet tray, you are not fasting.
> Your second choice is to forego your therapeutic diet
> trays and receive the Sahur bags.  However, the DOC is
> not obligated to provide 'special' or 'therapeutic diet'
> Sahur bags.  The record also reveals that Muslim inmates
> with documented medical limitations are not obligated to
> participate in Ramadan."

(Doc. 43 ¶¶ 5, 29; Doc. 51 ¶¶ 5, 29; Doc. 43-2 at 94).

Hampton believes that he lost an unknown amount of weight during the 2011

Ramadan season, based on how his clothes fit him, and suffered diminished health

in the form of leg and muscle aches.  (Hampton Dep. 54:20-58:15).  According to

defendant Gordon's nutritional assessment, the standard 2011 Ramadan diet, even

when items containing fish and onion are omitted, contains adequate calories and

nutrients to maintain an inmate's health for the 28 to 30 day fasting period.  (Doc. 43

¶¶ 108-09).  Further, eating all of the food provided during Ramadan meals but

omitting the fish and onions should not have resulted in a loss of weight or any

nutritional impairment.  (Id. ¶ 107).

The DOC offers the following standard diet options for inmates: (a) mainline,

which contains meat, fowl, egg, fish, and cheese products; (b) mainline alternative

Protein, which provides no meat products; (c) no animal products, a vegetarian diet;

and (d) kosher diet bag.[3]  (Doc. 43 ¶ 79).  In addition to these standard diet options,

the DOC offers the following ten standard therapeutic diets for regular meals: (a)

lactose restricted; (b) mechanical soft; (c) puree; (d) renal non-dialysis; (e) renal

dialysis; (f) finger food; (g) clear liquid; (h) full liquid; (I) BRAT; and (j) fat free for

tests.  (Id. ¶ 82).

Currently at SCI-Rockview, forty-three inmates receive specialized diets.  (Id.

¶ 89).  These specialized diets include three types of standard diets, fourteen allergy

diets, and three other nonstandard diets that must be prepared for these forty-three

inmates, in addition to mainline, kosher, and no animal products diets.  (Id. ¶ 89.)

---

[3] No animal product and kosher diet bag options can be obtained only with
the permission of the Religious Accommodation Committee, which is charged with
handling RLUIPA food-related requests.  (Doc. 43 ¶ 79).

Defendants quantify the impact of requiring therapeutic or religious diets for current fasts, feasts, functions, or holiday meals as follows: (1) for the Jewish faith - Fast of 10th of Tevet (2 bag meals); Fast of Esther (2 bag meals); Passover (27 bag meals, 2 ceremonial meals, and 1 feast); Fast of 17th of Tammuz (2 bag meals); Fast of 9th of Av (1 bag meal); Rosh Hashanah (1 feast meal); Yom Kippur (1 bag meal); Chanukah (1 ceremonial meal); (2) for the Muslim faith - Ramadan (28 to 30 bag meals, 28 to 30 full evening meals, and 2 feast meals) and Nation of Islam December Observance (30 bag meals, 30 full evening meals, and 1 feast meal); and (3) for the Native American Faith - Green Corn Feast/Harvest Meal (1 feat meal).  (Id. ¶ 97).

## III.   <u>Discussion</u>

### A.   **Religious Land Use and Institutionalized Persons Act ("RLUIPA") Claim**

Hampton's RLUIPA claim seeks both monetary and injunctive relief against defendants in their individual and official capacities. Section 3 of RLUIPA provides, in relevant part, that the government shall not impose "a substantial burden on the religious exercise of a person residing in  or confined to an institution . . . even if the burden results from a rule of general applicability," unless it demonstrates that the burden furthers "a compelling government interest" and does so by the "least restrictive means."  42 U.S.C. § 2000cc-1(a)(1)-(2).  RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  <u>Id.</u> § 2000cc-5(7)(A); <u>see also</u> <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 715 (2005).

Although Congress intended RLUIPA to be construed "in favor of broad protection of religious exercise," 42 U.S.C. § 2000cc-3(g), it also "anticipated that courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Cutter, 544 U.S. at 723 (observing that lawmakers "were mindful of the urgency of discipline, order, safety, and security in penal institutions"). Given this perceived intent, the Supreme Court held that when "requests for religious accommodation become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition." Id. at 726.

The court notes, as a threshold matter, that RLUIPA does not permit claims for damages against government employees in their individual capacities. Sharp v. Johnson, 669 F.3d 144, 153-54 (3d Cir. 2012) (joining the Fourth, Fifth, Seventh, and Eleventh Circuits and holding that RLUIPA "does not permit an action against defendants in their individual capacities") (citing Nelson v. Miller, 570 F.3d 868, 886-89 (7th Cir. 2009); Rendelman v. Rouse, 569 F.3d 182, 186-89 (4th Cir. 2009); Sossamon v. Lone Star State of Texas, 560 F.3d 316, 327-29 (5th Cir. 2009); Smith v. Allen, 502 F.3d 1255, 1271-75 (11th Cir. 2007)). Consequently, defendants are entitled to summary judgment as to those claims. See id. Nor can Hampton recover damages against the defendants in their official capacities. The Eleventh

Amendment bars claims for monetary damages against state officials in their

official capacities absent a valid abrogation of immunity by Congress or consent by

the state.  Kentucky v. Graham, 473 U.S. 159, 169 (1985).  Congress has not

abrogated the states' immunity against claims for damages under RLUIPA nor has

the Commonwealth consented to waive these protections.  Scott v. Beard, 252 Fed.

App'x 491, 492-93 (3d Cir. 2007) (because RLUIPA claim against prison official in his

official capacity "is essentially leveled against Pennsylvania itself, it is barred by the

Eleventh Amendment"); see also Cardinal v. Metrish, 564 F.3d 794, 798 (6th Cir.

2008) (holding that RLUIPA claim against a defendant in her official capacity "is

considered a claim against the State of Michigan" and barred by sovereign

immunity); Nelson, 570 F.3d at 883-85 (same).  Consequently, defendants are also

entitled to judgment as to the RLUIPA claims for monetary damages lodged against

them in their official capacities.

Hampton also seeks injunctive and declaratory relief.  To prevail on a

RLUIPA claim, a plaintiff must show that his religious exercise has been burdened

substantially by the challenged conduct.  Washington v. Klem, 497 F.3d 272, 277-78

(3d Cir. 2007).  The Third Circuit Court of Appeals has found that for the purposes

of RLUIPA, a substantial burden exists when:

> 1) a follower is forced to choose between following the
> precepts of his religion and forfeiting benefits otherwise
> generally available to other inmates versus abandoning
> one of the precepts of his religion in order to receive a
> benefit; or 2) the government puts substantial pressure
> on an adherent to substantially modify his behavior and
> to violate his beliefs.

15

Id. at 280.  If a plaintiff shows that prison administrators' action or inaction has imposed a substantial burden on the exercise of his religion, the administrator must establish that the challenged conduct furthers a compelling governmental interest and that it is the least restrictive means of furthering that interest.  Id. at 283.

There exists a genuine issue of material fact as to whether Hampton's right to freely exercise his religion has been burdened substantially by defendants' refusal to  provide him with a medically prescribed therapeutic diet tray during the 28 to 30 day Ramadan fasting period.  On the record before the court, a reasonable jury could conclude that defendants' practice of forcing Hampton to choose between a religiously-mandated fasting diet and a medically-mandated therapeutic diet is a substantial burden to Hampton's religious exercise.  A jury could also conclude, on the record before the court, that less restrictive means exist for accomplishing the government's objective.  Hampton's RLUIPA claim, to the extent it seeks injunctive and declaratory relief, will therefore proceed to trial.

### B.  Americans with Disabilities Act ("ADA") Claim

Hampton also contends that defendants' policies violate his rights under the ADA.  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Title II defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications . . . meets the essential eligibility requirements for the

16

receipt of services or the participation in programs or activities provided by a public entity." Id. § 12131(2).

Disability means, with respect to an individual, "(A) a physical or mental impairment that substantially limits one or more major life activities of such [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." Id. § 12102(1)(A)-(C). The Act directs that this definition be construed "in favor of broad coverage . . . to the maximum extent permitted" by the Act. Id. § 12102(4). However, "[m]erely having an impairment does not make one disabled for the purpose of the ADA." Toyota Motor Mfg. v. Williams, 534 U.S. 184, 195 (2002) (overruled on other grounds by the ADA Amendments Act of 2008)). To prove disability, a plaintiff must show that the impairment substantially limits a major life activity. 42 U.S.C. § 12102(1); Toyota Motor Mfg., 534 U.S. at 195. That is, a plaintiff must demonstrate a permanent or long-term impairment that "prevents or severely restricts" his or her ability to engage in "activities that are of central importance to most people's daily lives." Toyota Motor Mfg., 534 U.S. at 198.

In the matter *sub judice*, defendants argue that "placement on a therapeutic diet is simply not an impairment that limits one or more major life activities." (Doc. 52, at 2 n. 2). The court agrees. In fact, Hampton has failed to allege, much less establish, that his food allergies or therapeutic diet prevent or severely restrict his ability to engage in any activity centrally important to his daily life. See Toyota Motor Mfg., 534 U.S. at 198. Hampton consequently has failed to establish that he

suffers from a disability as contemplated by Title II, and summary judgment will be granted in favor of all defendants on Hampton's ADA claim.

### C.   Constitutional Claims

Hampton also alleges that defendants' conduct violated his First, Eighth, and Fourteenth Amendment rights.  Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials.  See 42 U.S.C. § 1983.  The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Id.; also Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).

### 1.   *First Amendment Exercise of Religion*

The First Amendment to the United States Constitution is made applicable to the states by the Fourteenth Amendment.  Cantwell v. Connecticut, 310 U.S. 296, 303 (1940).  It provides, *inter alia*, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . "  U.S. CONST.

amend. I.  The First Amendment offers protection for a wide variety of expressive activities.  See id.  These protections are lessened, but not extinguished, in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct.  Turner v. Safley, 482 U.S. 78, 89 (1987).  Although prisoners must be afforded "reasonable opportunities" to exercise the religious freedoms guaranteed by the First Amendment, see Cruz v. Beto, 405 U.S. 319, 322 n. 2 (1972), imprisonment necessarily results in restrictions on some constitutional rights, including the First Amendment right to the free exercise of religion.  O'Lone v. Shabazz, 482 U.S. 342, 348-49 (1987).  Only beliefs which are both sincerely held and religious in nature are entitled to constitutional protection. Wisconsin v. Yoder, 406 U.S. 205, 215-19 (1972); Dehart v. Horn, 227 F.3d 47, 51 (3d Cir. 2000); see also Africa v. Pennsylvania, 662 F.2d 1025, 1029-30 (3d Cir. 1981) (identifying three indicia of religion as (1) attempting to address "fundamental and ultimate questions having to do with deep and imponderable matters," (2) being "comprehensive in nature," consisting of a "belief system" rather than "isolated teachings," and (3) recognizing the "presence of certain formal and external signs" such as the clergy and observance of holidays).

The parties do not dispute that Hampton's sincerely held religious beliefs are entitled to constitutional protection.  The question before the court is whether the defendants' practices violated Hampton's right to freely exercise those beliefs.  To answer this question, the court must consider whether defendants' practices violate the Supreme Court's "reasonableness test."  See Turner, 482 U.S. at 89; O'Lone,

19

482 U.S. at 349.  The test examines four factors: (1) whether the practice in question

furthers a legitimate governmental interest unrelated to suppression of expression;

(2) whether there are alternative means of exercising First Amendment rights that

remain open to prison inmates; (3) whether the right can be exercised only at the

cost of less liberty and safety for guards and other prisoners, and the effect on

prison resources in general; and (4) whether an alternative exists which would fully

accommodate the prisoners' rights at *de minimis* cost to valid penological interests.

Thornburgh v. Abbott, 490 U.S. 401, 415–18 (1988) (citing Turner, 482 U.S. at 89-91).

The test's objective "is to determine whether the regulation is reasonable given the

prison administrators' penological concerns and the inmate's interest in engaging

in the constitutionally protected activity."  DeHart, 227 F.3d at 59.  However, prison

officials are not required to choose the least restrictive means possible in trying to

further penological interests, Thornburgh, 490 U.S. at 411, and it is the plaintiff's

burden to disprove the validity of a regulation or practice.  Williams v. Morton, 343

F.3d 212, 217 (3d Cir. 2003) (citing Overton v. Bazzetta, 539 U.S. 126 (2003)).

On the record *sub judice*, the court concludes that genuine issues of material

fact preclude summary judgment with respect to this claim.  Specifically, there is a

genuine question as to whether the prison policy, practice, or custom of requiring

an inmate to choose between receiving a medically-prescribed therapeutic diet tray

and his right to free exercise of religion, *i.e.*, participating in the Ramadan fast,

violates the "reasonableness test" set forth in Turner and O'Lone.  The court thus

finds that Hampton has established a sufficient factual dispute with respect to the

gravamen of his First Amendment claim to avoid summary judgment.  This does not end the court's inquiry, however, because Hampton has named a multitude of defendants, many of whom were wholly uninvolved in the particular acts which allegedly violated his constitutional rights.

Individual liability will be imposed under Section 1983 only if the state actor played an "affirmative part" in the alleged misconduct.  See Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1998)).  Liability "cannot be predicated solely on the operation of *respondeat superior*."  Id.  In other words, defendants in Section 1983 civil rights actions "must have personal involvement in the alleged wrongs . . . shown through allegations of personal direction or of actual knowledge and acquiescence."  Atkinson v. Taylor, 316 F.3d 257, 271 (3d Cir. 2003); Rode, 845 F.2d at 1207-08.  When a plaintiff merely hypothesizes that an individual defendant may have had knowledge of or personal involvement in the deprivation of his or her rights, individual liability will not follow.  Atkinson, 316 F.3d at 271; Rode, 845 F.2d at 1207-08.

Hampton has established that defendants Wetzel, Lamas, Kephart, and Klemm were personally connected to the alleged violation of his First Amendment rights.  The record demonstrates that Wetzel, in his capacity as Secretary of the DOC, is charged with establishing the DOC Food Services Policy at the center of Hampton's claim.  (Doc. 48-2 at 1).  Hampton also wrote Wetzel a letter expressing his concerns about the denial of a therapeutic meal during Ramadan, to no avail.  (Doc. 48-2 at 34).  The record also reveals that Klemm authored, and Kephart

Circulated, the 2011 memorandum outlining the restrictive options available to Hampton with respect to his conflicting medical and religious meal options. (See Doc. 43 ¶¶ 17, 20-21, 23; Doc. 51 ¶¶ 17, 20-21, 23; Doc. 43-4 at 2-6). Finally, Hampton has shown that Lamas served as Superintendent of SCI-Rockview and denied the appeal of Hampton's therapeutic diet grievance. (Doc. 43 ¶ 10, 28; Doc. 51 ¶ 10, 28; Doc. 43-2 at 81). Each of these defendants served in a supervisory or policymaking capacity at SCI-Rockview. (Doc. 43 ¶ 2, 10, 17-18; Doc. 51 ¶ 2, 10, 17-18). Hampton's freedom of religion claims will thus proceed with respect to defendants Wetzel, Lamas, Kephart, and Klemm, in their individual capacities, based upon their roles in establishing or maintaining a practice potentially violative of inmates' First Amendment rights.[4]  See A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Pet. Ctr., 372 F.3d 572, 586 (3d Cir. 2004); see also Santiago v. Warminster Twp., 629 F.3d 121, 129 (3d Cir. 2010).

Conversely, the court will grant summary judgment in favor of defendants Varner, Williams, Sowash, Gordon, and Ellers on this claim. Hampton alleges that Varner violated his First Amendment rights when, in reviewing his official inmate grievance, she failed to afford him the relief he requested. Similarly, he seeks to impose liability on defendants Williams and Sowash for their apparent failure to respond to inquiries or complaints. However, a state prisoner's allegation that prison officials and administrators responded inappropriately, or failed to respond

---

[4] As noted *supra*, recovery of monetary damages against these defendants is barred by the Eleventh Amendment.

to, a prisoner's complaint or grievance, does not establish that the officials and administrators were involved in the underlying unconstitutional conduct.  See Rode, 845 F.2d at 1207-08 (concluding that after-the-fact review of a grievance is insufficient to demonstrate the actual knowledge necessary to establish personal involvement);  Brooks v. Beard, 167 F. App'x 923, 925 (3d Cir. 2006) (same); see also Croom v. Wagner, 2006 U.S. Dist. LEXIS 64915, *4 (E.D. Pa. Sept. 11, 2006) (same); Ramos v. Pennsylvania Dept. of Corrections, 2006 U.S. Dist. LEXIS 51582, *2 (M.D. Pa. July 27, 2006) (same).  Hence, defendants Varner, Williams, and Sowash are entitled to summary judgment given their lack of personal involvement in the alleged denial of Hampton's First Amendment rights.

Defendant Gordon is entitled to summary judgment as well.  The record establishes that Gordon's only connection to Hampton was her preparation of a nutritional assessment based on his prescribed therapeutic diet.  (Doc. 43 ¶¶ 108-09).
Hampton has not directed the court to a scintilla of evidence tending to establish that this defendant was involved in the alleged violation of his First Amendment rights.  The same is true of defendant Ellers, who is named solely based on his supervisory authority over Gordon.  (Doc. 43 ¶ 107).  Accordingly, both defendants Gordon and Ellers are entitled to an entry of summary judgment.

## 2.    *Eighth Amendment Claims*

### a.    Conditions of Confinement

Hampton alleges that defendants treated him with cruel and unusual punishment by not providing him with nutritional meals during Ramadan.  (Doc. 11 ¶ 30).  The Eighth Amendment protects prison inmates from cruel and unusual punishment.  U.S. CONST. amend. VIII; also Farmer v. Brennan, 511 U.S. 825, 832 (1994).  However, not all deficiencies or inadequacies in prison conditions amount to a violation of a prisoner's constitutional rights.  Rhodes v. Chapman, 452 U.S. 337, 349 (1981).  To assert an Eighth Amendment conditions of confinement claim, a prisoner must satisfy both an objective and subjective test.  See Wilson v. Seiter, 501 U.S. 294, 298 (1991).  Specifically, a prisoner must show that (1) the alleged deprivation is "sufficiently serious" and (2) he has been deprived of the "minimal civilized measure of life's necessities."  Farmer, 511 U.S. at 834.  A prisoner must also show that "he is incarcerated under conditions posing a substantial risk of serious harm" and that prison officials possessed a "sufficiently culpable state of mind," demonstrating deliberate indifference to his health or safety.  Id.  However, only extreme deprivations are sufficient to prevail on a claim for unconstitutional conditions of confinement.  See Hudson v. McMillian, 503 U.S. 1, 8–9 (1992).  Mere negligence or inadvertence will not satisfy the deliberate indifference standard and cannot constitute a violation of the Eighth Amendment.  Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).

It is clear from the record that, at all times, Hampton was served food trays containing a sufficient amount of nutritionally adequate food. Hampton does not dispute that DOC menus are "designed calorically to maintain a healthy body weight and to provide adequate amounts of protein, vitamins, minerals and other nutrients needed to sustain an inmate's health." (Doc. 43 ¶ 105). And Hampton offers no evidence or argument to refute defendant Gordon's nutritional assessment of the 2011 Ramadan diet, which concluded that the diet offered adequate calories and nutrients to maintain an inmate's health for the 28 to 30 day Ramadan fasting period even after removing those items containing seafood and onion. (Id. ¶¶ 108-09). Moreover, removing seafood and onion items from the diet should not have resulted in a loss of weight or any nutritional impairment. (Id. at ¶ 107).

At the summary judgment phase, Hampton must offer more to the court than unsupported assertions, conclusory allegations, or mere suspicions in support of this Eighth Amendment conditions of confinement claim. See, Brightwell v. Lehman, 637 F.3d 187, 194 (3d Cir. 2011) (affirming the district court's grant of summary judgment to defendant when inmate's Eighth Amendment claim was supported only by speculation, conclusory and ambiguous allegations, and vague inferences) (quoting Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252, 254 (3d Cir. 1999)). Hampton's failure to create any dispute of fact as to whether he has been deprived of the "minimal civilized measure of life's necessities" is fatal to his claim. Farmer, 511 U.S. at 834. Judgment will be entered accordingly in favor of all defendants on the conditions of confinement claim.

b.    Deliberate Indifference to Medical Needs

Hampton also alleges that defendants were deliberately indifferent to his serious medical needs when he was deprived of his medically prescribed diet tray during Ramadan.  The Eighth Amendment's proscription against cruel and unusual punishment unequivocally extends to prisoners the right to adequate medical care. Estelle, 429 U.S. at 103-05.  In order to set forth a cognizable claim, plaintiff must allege (1) a serious medical need and (2) acts or omissions by prison officials that indicate a deliberate indifference to that need.  Estelle, 429 U.S. at 104; Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir.1 999).  A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm.  Farmer, 511 U.S. at 837.  A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." Estelle, 429 U.S. at 104-05.

Defendants have failed to address this claim in any manner in their motion for summary judgment.  Therefore, this claim will proceed to trial.

### 3.    *Fourteenth Amendment*

Hampton also claims that defendants "have not treated [him] equally in the way other Muslims were treated during the Holy month of Ramadan by not providing [him] with foods [he] could eat as they did others."  (Doc. 11 ¶ 31.)  The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV.  In other words, the state must treat similarly situated

26

persons in like fashion. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (citing Plyer v. Doe, 457 U.S. 202, 216 (1982)).

Defendants argue that Hampton has failed to meet a threshold requirement of an equal protection claim by not alleging differential treatment between himself and any specific group or class of similarly situated individuals.  (Doc. 52 at 10-11). An equal protection claim, however, can be brought by a "class of one," a plaintiff alleging that he has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); Williams v. Morton, 343 F.3d 212, 221 (3d Cir. 2003); also Jean–Pierre v. Bureau of Prisons, 497 F. App'x 164, 168 (3d Cir. 2012).  This is precisely what Hampton alleges, and the court rejects defendants argument to the contrary.

If a distinction between persons does not implicate a suspect or quasi-suspect class, as is the case here, the state's action will be upheld if it is rationally related to a legitimate state interest.  See Tillman v. Lebanon County Corr. Facility, 221 F.3d 410, 423 (3d Cir. 2000).  Proof of disparate impact alone is not sufficient to succeed on an equal protection claim, and a plaintiff also must prove that the defendants intended to discriminate against him.  See Vill. of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 264-66 (1977); Washington v. Davis, 426 U.S. 229, 242, 244-45 (1976).  Discriminatory intent must be a motivating factor in the state's decision, even though it need not be the sole motivating factor.  Arlington Heights, 429 U.S. at 265-66.  Moreover, to prove lack of rational basis, a plaintiff must negate

every conceivable rational basis for his differential treatment.  See Bd. of Trustees v. Garrett, 531 U.S. 356, 367 (2001); Ramsgate Court Townhome Ass'n v. West Chester Borough, 313 F.3d 157, 160 (3d Cir. 2002).

There is a genuine issue of material fact with respect to whether Hampton's differential treatment is rationally related to a legitimate state interest.  As a result, the Equal Protection claim will proceed to trial.  However, for the reasons the court stated *supra* with respect to individual liability, the claim will move forward against only defendants Wetzel, Lamas, Kephart, and Klemm, as each allegedly had a role in establishing and maintaining the policy or practice which allegedly resulted in differential treatment of Hampton.  Evancho, 423 F.3d at 353.  Defendants Varner, Williams, Sowash, Gordon, and Ellers are entitled to summary judgment for lack of personal involvement in the purportedly unconstitutional conduct.  See id.

### D.    Qualified Immunity

Defendants raise the doctrine of qualified immunity in defense to each of Hampton's claims.  Qualified immunity protects officials from civil liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009).  The doctrine attempts to balance "the need to hold public officials accountable when they exercise power irresponsibly" with "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  Id.  The protection is broad and generally offered to "all but the plainly incompetent or those who knowingly violate the law."  Malley

v. Briggs, 475 U.S. 335, 341 (1986).  Qualified immunity is generally a question of law that should be considered at the earliest possible stage of proceedings; however, the existence of genuine disputes of material fact may preclude summary judgment on qualified immunity.  Giles v. Kearney, 571 F.3d 318, 325-26 (3d Cir. 2009).

A qualified immunity determination involves a two-pronged inquiry: (1) whether a constitutional or federal right has been violated and (2) whether the right was clearly established.  Saucier v. Katz, 533 U.S. 194, 201 (2001) (overruled in part by Pearson, 555 U.S. at 236, to the extent Pearson permits federal courts to exercise discretion in deciding which of the two Saucier prongs should be addressed first).  The factual issues set forth in this memorandum are obstacles to both Saucier prongs.  The basic constitutional precepts in play are clearly established.  It is the application of those precepts to the factual disputes outstanding which precludes summary judgment.  Any decision on qualified immunity, which inherently involves constitutional liability inquiries, is premature.  Giles, 571 F.3d at 325-26.  Therefore, defendants' motion will be denied on this ground.  The denial is without prejudice to defendants' right to raise the defense at trial.

**V.**     <u>**Conclusion**</u>

For all of the foregoing reasons, defendants' motion (Doc. 42) for summary

judgment will be granted in part and denied in part.  An appropriate Order will

issue.


              /S/ CHRISTOPHER C. CONNER
              Christopher C. Conner, Chief Judge
              United States District Court
              Middle District of Pennsylvania


Dated:        March 31, 2014